May it please the Court. Aurora Buick on behalf of Petitioner Mr. Riad Abdelkader Aymo. This case centers on an adverse credibility determination, which the IJ based on faulty translation, improper speculation, and a failure to consider the totality of the record. The three, albeit unpublished, cases that this Court recently decided illustrate why each of these three grounds is improper. For example, in Kudriazov, interpreting the Shrestha standard, this Court found that trivial details or differences, which could be explained by interpreter error, are not the valid basis for an adverse credibility determination. There, it was the inability to name the medications the petitioner took, minor differences in dates, and different names for medical treatment. Here, Mr. Aymo couldn't remember how much cash he had in his pocket while he was at the cafe before he took public transit, went to the Capitol, and took out $10,000. Similarly, in Nwadanobi, interpreting Kumar v. Gonzalez and Drew v. Holder, this Court found that adverse credibility determinations couldn't be based on improper speculation. There, it was about Nigerian bureaucracy. Here, we have the issue of the Kibele ID system, which the petitioner explained correctly, and the IJ just didn't believe. Similarly, in Nwadanobi, interpreting Hovey Ashcroft, again, we find that small differences based likely on interpreter error cannot be the basis of such an adverse credibility determination. Here, we have the escape versus release issue in the Record of Sworn Statements. When we actually have the interpreter at the hearing using the word escape to mean leave the room, it's at every couple of hours. The people that were beating him escaped the room and came back, so it's pretty clear that that was probably just an interpreter issue. I have a question after reading your reply brief. I want to get a better understanding of what, at this point in the case, you're arguing. Are you still arguing primarily that there was a due process violation as a result of translation or translation errors? Or are you kind of pivoting now, because of the exhaustion problem you have with that, to an argument that the IJ and BIA's credibility determination were not supported by substantial evidence, partly because they were infected by translation errors, and partly because the IJ appeared to think that her job is to simply deny asylum applications, rather than objectively consider asylum applications? Right. Well, I think there are a lot of different questions in there. I think, one, this rose to the level of a due process violation, because when I look at the record, I don't see the inconsistencies that the IJ points out, which makes me think it was either bias or, like in Perez's last story, she just couldn't understand the interpreter's broken English. In terms of the exhaustion issue, in his pro se appeal, he talks about the transcripts will demonstrate that I was credible and consistent, which, as in adjeman, I don't know how to pronounce it, we say there are no magic words. So I think, in a way, he preserved it when he said the transcripts will show I'm credible. Nevertheless, as an argument three of the opening brief, I think whether it's on de novo or just under the Shrestha standard, of sufficient evidence to support the adverse credibility determination, this case warrants reversal. Well, you mean you want your petition granted? Correct. Thank you, Your Honor. Too much criminal defense work. And then what's the, I mean, sort of going through the different findings that the IJ made, I mean, it seems like a lot of them were pretty off the wall. But what is the standard? These guys have done a lot more immigration cases than I have, and I'm less familiar with the law in this area. So what is the standard for reversing an adverse credibility determination by the IJ slash BIA? I mean, I assume it's really hard to do. And there may be some findings that the IJ made with respect to credibility that are not particularly assailable, even though it seems like the IJ was biased and all that. You know, there were a couple findings, for example, the findings about the circumstances in which Mr. Imo left the country, where, you know, if we were just viewing that credibility finding in isolation, it might be that the IJ was biased. It might be supportable. Is that enough to prevent granting the petition on the ground that the adverse credibility determinations were not supported by substantial evidence? Or do we view it sort of more in, do we view the credibility determinations more in their totality? Well, I think the Ninth Circuit uses a nuanced substantial evidence standard that takes into consideration whether the difference in credibility in the IJ and the BIA differences were very trivial, whether if the IJ was speculating, whether there were cogent reasons. As to the issue of there being other assailable issues, when I look through, I outlined all of the things mentioned in the BIA decision, which I think under the lie standard is all we're looking at here, and I didn't find a single example that I felt held up. And I would be happy to address any of the examples from the BIA decision or even the IJ's written decision. Could you remind me, did the BIA address the issue of his testimony regarding the circumstances in which he left the country? So I think there was one part, well, I'm not sure if the BIA went to the banking. Let me see. You know, I don't think there was any finding. To the issue about, you know, he happened to have his passport with him when he was at the coffee shop and all that. The BIA talks about the fact that he says the passport was lost in Colombia, and, for example, goes into, the IJ asks what was in the bag, and he says, money, my passport, some other documents. And then later he had money, and the judge finds it inconsistent that he lost money but had other money, and I don't see anything inconsistent about that particularly. There was the online banking issue, which the BIA doesn't get into, but, you know, I used to live in East Africa. Just because you have access to an ATM doesn't mean your account is set up for online banking in the way we see it now.  It's frustrating for me when I look at the record because I know it's just the way it is, you know. So I really look back to the speculation about bureaucracy that the Nwadanobi case talks about as improper. You know, I don't think Mr. Aimo was required to talk about how to get a Cabelae ID, but he did. He even knew that there were three witnesses required to do this, and that is the way it works. Let me ask you, was the Amnesty International report included in the record before the BIA? Yes, it was, this lengthy, because I am a ROMO, and I know my time is almost up, well, the two minutes. Even if, so under Bautista-Lopez, and I know it's an unpublished opinion this court talks about, even if an adverse credibility determination was upheld here, the IJ's failure to look at the totality of the record itself justifies remanding this case back or otherwise granting relief. Neither the BIA nor the IJ mentioned the Amnesty International. And the IJ specifically said she didn't consider the reports because he said he wasn't actually involved in the protests. When the Amnesty report itself, the DW, the German news article, all said that it's people suspected of being involved, people related to people, there was a talk about a singer, relatives, all getting arbitrarily detained, signing release letters just like this, and then some of them later being killed right around the time that he fled for his life because he knew people were getting killed. So I think the failure of the IJ to look at the totality of the record both impacted the credibility determination, and also as a separate grounds for relief. All right, do you want to save some of your time? May it please the court, I'm Jonathan Robbins here on behalf of the respondent to the Attorney General. Good morning to all of you. Good morning. So the issue in this case is whether the record compels reversal of the agency's adverse credibility finding. And there are a plethora of inconsistencies and plausibilities and vague testimony. When I read it, it seems like a lot of it is attributed to the translation. Well, I respectfully disagree, Your Honor. In fact, I think... It can't make sense. I mean, this is a terrible transcript. Well, there are some breaks in the transcript, Your Honor, but I don't think it was an issue of translation. The petitioner was asked multiple... When I read it, it looked like the IJ simply didn't understand the translator. That's not what I read, Your Honor. Very, very... The judge asked... There are a couple instances, but I don't think that was an issue of translation. If you'll allow me to explain. First, the IJ repeatedly asked the petitioner if he understood the interpreter. There was actually a problem. The petitioner kept jumping ahead of the interpreter because he also understood the English. So he wouldn't wait for the interpreter to go forward. But the problem is, even assuming in some instances Mr. Amo understood the interpreter, it's not at all clear that the interpreter understood Mr. Amo or that the interpreter understood the IJ. Well, if you have a specific instance of that happening, I'm happy to address it. I mean, it's the whole transcript. I don't agree that it's the whole transcript, Your Honor. I think there were instances where I think the immigration judge had trouble hearing petitioner. For example, there was an issue where the judge heard the word, armored vehicle, when the petitioner had said, armored people, and it took a little while to get that squared away, but eventually they did, and ultimately the petitioner explained, I'm talking about people armed with weapons. So I don't think that was an issue of translation. Now, I'm addressing the merits to answer Your Honor's questions, but I don't want to concede the point that this is not an issue that was exhausted before the board, and the court should not be looking at translation issues. Well, he was pro se, and he did say, if you read the transcript, I'm credible. And the IJ's decision and the decision the BIA upheld was an adverse credibility finding. So I don't know why that's not enough from a pro se person. Well, because he didn't bring any issues about translation. He said, I testified truthfully. So he brought up the issue of the adverse credibility decision. Right, but Your Honor, that's very distinct from a translation error. That's a completely different argument, whether or not you testified truthfully. No, he's saying that if there hadn't been a poor translation, he would have been deemed credible. Respectfully, and I don't believe he said anything about a poor translation. No, he didn't specifically use the words poor translation, but he said, if you read the transcript, I am credible. Right, but that is a separate and distinct argument, Your Honor, from the notion that there's a translation error. I don't think we hold pro se people to that standard. And respectfully, Your Honor, Petitioner repeatedly on the record said that he could understand the interpreter. That's not at issue. He didn't argue. When the immigration judge asked him if he understood the interpreter, he said yes multiple times. There's clearly passing in the night here. And the, you know, I don't know. The IJ was, the way she handled this whole thing was very, very troubling. No, I haven't seen transcripts this bad in a long time. Honestly, there was, you know what, there was a time, and it was about, I don't know, maybe 10 years ago, where we saw these all the time. But I haven't seen one like this in quite a while since they reformed all the, improved the quality of the IJs, I guess. They undertook a massive effort. I actually had one that was this bad when I was a lawyer and I was arguing a case in front of Judge Pius, and the transcript was just as bad as this one. But seriously, seriously, we've seen lots of transcripts over many years. So have I, Your Honor. I've seen them as well. 20 years of seeing transcripts? Well, 12 years. Well, I've been 20. He's been more than that. 18. 18. If Your Honor has a specific point on the record, do you have a particular point? No, I'm not going to argue with you about it. I'm going to read the transcript and law and make a decision. I'm not going to sit here and argue. You want to point out to me where, why this transcript was good? Yes. Well, I think, well, I would like to address some of the things that you think are problematic because I don't think they're problematic. So, for example, on page 1. But they're raised in the brief. So you can respond to the brief. Right. Okay. So, for example, take page 112. Let's start with the beginning where they say page 91. They say that there's a question with the interpreter here on page 92. 91 and 92. It says to the respondent, do you understand the interpreter? And the Petitioner's attorney said they haven't spoken to each other yet. And then the judge talks about how there's a problem with the batteries in the equipment. And then he says to the respondent, do you understand the interpreter speaking to an AROMO? Mr. Imo says yes. All right. And then they move on. And, if you look, that only lasts a page before the hearing's continued. So this supposed interpretation problem only lasts one page before the hearing's continued, and it was resolved anyway. If you move on to page 112 where there's a problem, where there's an alleged problem. What about the one where he, what about the one where the IJ accused him of providing inconsistent testimony by initially saying that his father was only arrested twice, and then later specifying that his father was currently in custody after apparently a third arrest? Right. Okay. I mean, that, it may be, it may be that that is attributable not to a IJ's naked desire to undermine the credibility of the petitioner before he has a chance to talk. I grant you that that is possible. But, but the transcript seems to have, I don't know if it's the transcript or the interpreter, but there's an error where the interpreter initially says he was arrested two times and then corrects it to he was arrested a second time in 2000. I think, I'm not sure I'm getting the year right. And it sounds like the IJ sort of pounced on that to conclude that when he later described a third time that the father was in custody, this was inconsistent with Mr. Imo's prior testimony. Doesn't that, I mean, isn't that either just really inappropriate conduct by the IJ or a translation error? Well, here's what I would say. With respect, it seems like Your Honor is conceding that that may not be a translation error. I agree that I don't think it is. With respect to the immigration judge pouncing on him. Well, the case law says that immigration judges are allowed to aggressively question people, particularly when they're probing to determine the truthfulness of their allegations. And you might think that it's a bit unfair. But if you look at it. Well, I mean, I think the problem is the totality of it, right, is that it's not, it's not the aggressive questioning. But it's the aggressive questioning right out of the box, right out of the box, on the first, during the first hearing, going all the way through the three hearings, combined with some of these totally implausible factual findings that she's making about his credibility. For example, the, you know, the factual finding that he was not credible because he couldn't remember enough details about the room he was in or enough details about the letter that they forced him to sign. Well, Your Honor. Those conclusions just defy common sense, which, again, raise a concern that either she's, you know, either she's not doing her job, she's completely abandoned her responsibility as an objective arbiter, or she's, you know, these translation issues made her frustrated and she made mistakes as a result of those issues. Well, Your Honor, I would agree that some of the inconsistencies looked at in isolation would be trivial. Or both, by the way. It seems like it could be both. True. That she was biased and that the process was plagued by translation errors. Well, respectfully, Your Honor, I don't think it's biased, because a biased immigration judge wouldn't have given a petitioner an opportunity to corroborate the story. At the end of all these inconsistencies, first of all, they're not just trivial inconsistencies, they're also big inconsistencies. There was a corroboration in the Amnesty International report, and she didn't look at that. Yes, she did, Your Honor. On page 66, the I.J. expressly acknowledges that particular document. To begin with, the court acknowledges that... Wait. Page 66 of what? Third paragraph. It's page 66 of the administrative record. Okay. To begin, the court acknowledges that the respondent has provided country condition reports and news articles discussing the violent treatment of pro-Roma protesters in Ethiopia. So that was definitely considered by the immigration judge. Now, as far as the end of the hearing, by the way, the immigration judge said, look, you just told me a story where you said you took out $10,000 from the bank. I'm going to continue this case for a month. Go get me your bank statement to prove that that's the case. Print out your bank statement. The immigration judge and the government attorney went online, and they said this is an online bank, they have online access. It's a matter of simply clicking and printing out your statement. If you come back with a statement that says you pulled out $10,000, that goes a long way towards showing that what you're telling the immigration judge is true. If you come back with a statement that shows you didn't take out $10,000, it shows that it's not true. And what did Petitioner do after a month of continuance, specifically to get a document that took about five seconds to get? He came back with nothing. How do you know that? Because that's in the record. That he would have been able to access online, that there were online records as of 2015 in Ethiopia when he left. How do you know that? The immigration judge and government attorney both checked and told him that they saw that there was online access. As of what time? As of, that was on, let me get the exact date here, June 26, 2016. Right, and guess what? What? Online banking didn't really even begin until 2015 in Ethiopia. I've had a case exactly like this before where the IJ excoriated a Petitioner, in fact it's an opinion, excoriated a Petitioner because the Petitioner was from China and he said he had withdrawn funds on a Sunday and the IJ excoriated him, found him lacking credibility because in the IJ's opinion banks weren't open on a Sunday. And guess what? We looked that up, banks were open on Sunday in China. At the time, at the time. And that's one of the big problems I see with this, the assumptions of the IJ that things in Ethiopia during this time of crisis would operate exactly the way they do in the United States today as of 2016. And this is another problem that I haven't seen in a really long time. I think I wrote that opinion about 10 years ago. Well, here's the thing, Your Honor. When the immigration judge continued the case, he wanted to know why did you not, why were you not able to get these banking statements. Petitioner didn't say they weren't available. He said, oh, my brother tried to get them and his brother who had been present to testify on his behalf at the previous hearings didn't show up for this hearing to testify to that. But what does that mean? How did he try to get them? They didn't have them online in 2015. How does the immigration judge supposed to know that? Because the immigration judge is supposed to understand the country conditions in Ethiopia in assessing the credibility or not of an asylum seeker. That's why an immigration judge should know that. Right. But it's always petitioner's burden to present their case. And he was represented by counsel. They could have brought that explanation to the immigration judge if they said that it wasn't available. They didn't make that argument. They just said, oh, the brother's not here to testify and we don't know anything about it. I mean, if the case had continued for a month and you just came back empty handed with no explanation, what is an immigration judge supposed to think? I think that certainly a reasonable fact finder could infer from that that he purposefully didn't get any bank statements. All right. I see I'm out of time. Thank you very much for the extra time. We gave you an extra two minutes. And I think counsel for the petitioner has some time left, too. Thank you, Your Honor. So I just have a few replies, rebuttals to what counsel. How did you respond to the last thing that he argued? Well, one, I think the BIA did not include the online banking issue. So under lie, it might not be before the court, although, of course, totality of the circumstances. However, as Your Honor pointed out, this just isn't the way things work. So I think under the Kumar v. Gonzalez standard, the immigration judge wasn't allowed to speculate about bureaucracy without a cogent reason. It's just the fact that because you can use your ATM card doesn't mean that you can use online banking in the sense that we think, you know, you go on and you download a report. The petitioner said he doesn't know his account numbers anymore, so he didn't know. Was he in detention at the time? Yeah, he was in detention up until very recently. But did he have access to a computer at the detention facility? No, Your Honor. He didn't have access. Not as far as I know. I'm sorry. I wasn't representing. Do we know? I don't know if he had access to a computer. Do we know? Did he testify that his account was still active at the time he was in detention? I think he had no idea, and he didn't try to speculate. He said he didn't know his account numbers anymore, and that's just not the way it works. Well, he said, the judge said, really, so there's no online, like, very sarcastically. She said, did you have access to your bank account information through a computer on the Internet, your own computer on the Internet? Answer, no, there was no such system in Ethiopia. No. There is no what? There is no such system in Ethiopia. Really? So there's no online banking in Ethiopia? The employees can do online banking, maybe transaction, the internal work, but every customer, me as a customer, cannot access my account and do any accounting online. No. Okay, so have you ever registered to do online banking? No. No, there is no system of registration. Or I didn't. Sir, is it your testimony that the system does not exist or that you have never used it? You must answer that question, or I will draw an inference. There is no system, actually, where the customers can use it. I mean, I don't know how many times you had to answer that question. So the IJ was told there was no system. That's your answer. Thank you, Your Honor, and I just don't see it as vague. As to the faulty translation issue, I think as in Perez Laster talking about a due process argument said, the faulty translation can also be the immigration judge's inability to understand the interpreter. So even if Mr. Imo says, yeah, I can understand what the interpreter is saying to me, that doesn't necessarily mean the immigration judge can understand. Finally, while the judge here did say she acknowledged the report, she specifically said she didn't consider it because Mr. Imo wasn't himself involved in the protest, rather his students, his father, his two dead uncles, et cetera. And what was his thing about taking a month off and he was supposed to bring back his bank records to clarify the $10,000 issue? No, she did keep continuing the hearing after he had been in detention for a long time and basically implied she'd given adverse credibility determination unless he found those banking records. And it appears from the record that he and his counsel made some attempt and they couldn't find online banking records. All right. Thank you, counsel. Thank you, Your Honor. Imo v. Sessions will be submitted. The court will be in recess for approximately five minutes.
judges: Wardlaw, Paez, Chhabria